317-07-970 Boyd Roberts v. E.S.F. Good morning. If it pleases the Court and Council, my name is Karen Connolly, and I represent the Petitioner, Mr. Boyd Roberts, in this matter. Please excuse me, I'm a little hoarse today. I am here today to ask you to reverse the decision of the Workers' Compensation Commission, specifically finding that it has the manifest way of gaining confidence with regard to the issue of causation. In this case, the arbitrator and the Workers' Compensation Commission relied on not finding causal connection on the decision of Dr. Cohn. Dr. Cohn testified to his understanding of the mechanism of injury of the Petitioner. His understanding of the mechanism of injury is diametrically opposed opposite to the way the Petitioner testified. The arbitrator found the Petitioner's testimony credible. He found that it was an accident and that the accident had occurred in a way that the Petitioner testified. Didn't the claimant testify that he struck the padlock using the heel of his hand? The Petitioner testified that he was holding the padlock, a large padlock, about a six-inch padlock, in one hand, his left hand. He struck it from the bottom, across the fleshy bottom part of his heel, across his animation. He clarified that it was from the fleshy part from his thumb to the area underneath his fifth finger in an upward motion. And Cohn didn't address that? I thought Cohn testified in the form of a deposition that striking of a padlock using the heel of a hand, as you just described, would not have caused a hyperextension or wouldn't have caused a tear. Isn't that what he testified to? He goes on further to testify. So, first of all, the Petitioner did testify that he hyperextended his hand. I know that, but Cohn said that the way the claimant described the mechanism of injury couldn't have caused the hyperextension or the tear. Isn't that what Cohn testified to? No, Cohn testified that it's his understanding that the Petitioner had his hand and his wrist working together and the muscles contracting to make it one piece that he used as a hammer. He testifies he uses it as a hammer, and that does not, and that is not what his, I'm sorry, the word that he used was stabilize. He stabilized his hand and wrist and used it as a hammer. It's on page 30 of his demonstration of hyperextension. This all comes back to my simple understanding of this case. What's hypereflection? Hypereflection is when it was bent backwards. Swing is bent backwards. Yeah, I'm not going to do it, I'm sorry. Yeah, I know, but it's when it's bent backwards. When it's bent backwards, the Petitioner is set to a 45-degree angle, which is obviously not a normal angle in which one's hand rests at. The Petitioner felt immediate pain. He went in and he reported it to the dispatcher and told them that he needed a new lock and told them what had happened. He did wait a little bit to receive medical care, and he testified, but that's because he just really hoped it would get better, and when it didn't, within two weeks, he went to the company doctor. They decided something was wrong with him. They sent him for MRIs, which show those escapolamate ligament tear and the TCFF, or the TFCC tear, and sent him on to the orthopedic surgeon where he was. Now, that tear supposedly happens through hyperextension, correct? Yes, and Dr. Cohn agrees that those types of tears do happen through hyperextension. But isn't it just basically that the point of impact and an uppercut to close that lock, if it's hitting on the edge here of where it's described, that that doesn't create hyperextension? Well, I think in this circumstance it did, Your Honor. It's a big lock. So it's not like a little gym cap lock, but if you hit it here, it's only about that wide. It's a big 6-inch lock that closes a full semi-truck and keeps that big lock open. Well, we're talking 6-inch in terms of the length of the lock. 6-inch is the length of the lock. But the main characteristic would be how thick is that lock that you're hitting. And I will agree that that information is not contained in the record. However, the arbitrator did find it, and the commission made no actual findings. So it's as though the arbitrator found it. They just adopted the decision of the arbitrator. But the arbitrator found the petitioner credible and agreed that the accident happened when his hand was hyperextended when he hit her on the left. He actually demonstrated the strength at which he used to hit his hand to use his hand in an upward motion. And the commission heard his testimony. And I think you've attempted to point out the problems with Dr. Cohn. Who's Dr. Lyles? Dr. Lyles is the surgeon. Did he provide any evidence of a causal connection? In his records, he indicates that the petitioner's condition post-surgically would be both tears and the reflux sympathetic dystrophy. However, he did not testify that it was a causal connection between the tears and the accident, did he? He did not. Although Dr. Cohn, who is the physician to whom he was sent by the company and treated him as an industrial medicine doctor and treated him up until the time when tears were diagnosed,  And your partner, I suggest, may say that Dr. Dunbar is not an orthopedic surgeon. Dr. Dunbar is not an orthopedic surgeon, but Dr. Dunbar is an industrial medicine doctor. Dr. Dunbar is the company doctor. And Dr. Dunbar certainly had a very good understanding of what happened. As she saw him initially, sent him for the appropriate tests, made the diagnosis, and then sent him on for orthopedic care. So I believe as well as I feel pervy to be able to comment on the relationship between the accident and the condition of the person who is continuing on for treatment, I would further note that Dr. Dunbar actually was aware of the correct mechanism of injury and was not testifying to something very different or based on something very different from what the petitioner testified actually happened. Okay, so admittedly we have conflicting evidence. On behalf of the claimant and the commission, we have Dr. Cohen. So why is this against the manifest way? Why is an opposite conclusion clearly apparent here? Well, I think the opposite conclusion is clearly apparent because Dr. Cohen's testimony is clearly, clearly unreliable. He did not understand or was not aware of the mechanism of injury. There's a very big difference between hitting a padlock like this and with such strength that it bends your hand back to a 45-degree angle and stabilizing your hand and wrist and using them as a hammer to close a lock. Aren't you reading something into this? Cohen testified, didn't he, that he used it as a hammer? Did Cohen ever say it had to be in an upward or downward motion? Wasn't he just referring to striking the padlock? Were we getting this that he definitely said it was a – On page 30 of his deposition, and if you'd like I'll look up from my calculator. Well, summarize it for us. He says – and I agree with you. I thought – and I even tried this case and I didn't take his deposition so I was sort of coming into it with a clear mind. I didn't know very much about the case. And I thought that that's what he was going to say until I got to the part where he was very, very specific with the stabilizing hand and wrist and using it as a hammer. Now, this is understanding of the mechanism. Hammer we understand, but what's this about? You're characterizing this that he got the direction wrong. Did he ever specifically opine in which direction it was? He did not. Well, then how do we – why are you talking about upward-downward motion? Because the petitioner testified that the accident happened when he hit the padlock in an upward motion, bending his hand back. What Dr. Cohen says is it could not have torn his – either the triangular fibrocartilage or the scapular ligament because his hand was stabilized and he was using it as a hammer. And those are completely opposite actions. If he had said, well, I understand that he had hit it hyperextending his hand or not hyperextending his hand, that would be different than when he went and he said it was a very specific motion to stabilize his hand and that's different than what happened. And you cannot – you cannot rely on expert testimony that isn't based in the facts of what actually happened. It sounds to me that you're making an assumption that a hammer motion is always a downward angle. I would have to agree with that, yes. But, I mean, then you would be saying that he was stabilizing his hand and wrist and I don't know how you would do that, somehow hitting the lock like that. But you could certainly do that with a hammer. You could, but not for him. And he wasn't using a hammer, he was using his hand. And, again, the very specific testimony was that his hand was hyperextended and not stabilized in order to hit it to close the lock. He bent his hand back at a 45-degree angle. And when Dr. Cole testifies, he testifies both that hyperextension is one of the causes of those types of tears. And he goes on to testify that – he initiates a second finding that the tears are degenerative in nature, which is also not based at all on the testimony. There's no indication that the tears are degenerative. Dr. Cole, in fact, testifies that he doesn't know whether they're degenerative or not. He can't tell from the MRI. What is the clue, because this can certainly rest upon, where did the hand come in contact with the bottom of the lock? Yes. Now, he testified he struck the bottom of the lock to make the tumbler come into – I don't know the exact – I assume it's a U-lock. And he's holding it like this, and he's uppercutting to close it. Where does he say he comes in contact with the lock? What part of the hand? Dr. Cohn testifies – Not Dr. Cohn. What did the claimant say? Oh, I'm sorry, the petitioner? Yes, the claimant. The petitioner, the claimant. He testifies on cross-examination that he hits the lock at or across the base of his hand. What did he do? What did he testify on direct? Why are we waiting until cross to get this out? Was he called as an adverse witness? No, I believe that it was clarified at cross-examination. Oh, okay. To his benefit, I may add, again, I didn't try. You didn't try. I understand. I just wanted to make a – You washed your hands of the trial, yes. No, I don't do that. I certainly wouldn't do that. I've never cast aspersions on a former colleague who tried the case. I thought he actually did a good job. Well, let's go on a little bit fast. On cross-examination, we finally find out. He testifies that it is across the base of his hand, and counsel asks him, do you mean like the fleshy part of your thumb, the bottom part of your thumb? Yes, and the bottom part of your fifth finger. When you look at Dr. Cohn's testimony, he testifies that it was hit on the center – I'm not saying it's right for the center on the X – of the bottom part of the fifth finger, which is on this side. He's going this way. Like that. And that is why I believe that he thought that the hand was stabilized, and he was hitting it like this. That's a good argument because that's not an uppercut motion. And who testified as to uppercut? The petitioner testifies as to uppercut. Yeah, well, in boxing, you know what an uppercut is. You're saying that the doctor did not know what an uppercut was. Well, that is my – and that is a reasonable interpretation, which talks about the stabilized wrist only hitting the center on the X of the fifth finger. So that was a downward chopping hammer motion. Wouldn't this be an easier case if the plaintiff had testified it was the fleshy part of the palm, which creates a hyperextension? Yes, but he did testify to the hyperextension. He's also a truck driver, not a doctor or an engineer, who is well versed in being able to describe specific mechanisms of hand motions and even the technical names for the various parts of the hand, which is obviously a very complicated structure of the body. Yeah, but just where the point of impact on the base of the lock doesn't require a lot of technical expertise? You know, again, that may have been a question I would have asked had I been the person asking the questions. I am not. But I think the evidence that is here before us today is substantial and strong, and it indicates that Dr. Cohn was not working with the correct mechanism of injury, and therefore his testimony cannot be relied upon. So if we take out Dr. Cohn, what do you have? We have Dr. Dunbar and Dr. Lyles and the testimony of the petitioner. The testimony of the petitioner alone should be sufficient in order to establish causal connection. I mean, the testimony of doctors are helpful, but the testimony of years and years and years of decisions have indicated the testimony of the petitioner were credible. It's sufficient to establish causal connection. Yeah, but it doesn't override. You're not saying that the testimony of a claimant is to be given more weight than the testimony of an expert, are you? Oh, no, sir. And I'm saying the testimony of this expert in this particular case cannot be relied upon because it is not based upon the correct mechanism of injury. Now, when you look at the fact that the petitioner testified and there was about six or seven years of his family physician records entered into evidence, there's no evidence. He testifies that there is not, and there's also no evidence that he ever had any sort of problem with his hand, with his wrist, with any part of that area of his upper extremity, that he felt immediate pain upon performing this action where his hand was hyperextended, that he went in and told his dispatcher about it and asked for a new lock for his truck, that he saw medical treatment shortly thereafter when his condition did not improve itself on its own, that the terrorist showed up in the MRI, where he had never had any complaints or problems with his hand or wrist before that, and that he was then diagnosed and treated. Dr. Lyle and Dr. Dunbar, well, Dr. Dunbar explicitly sets up the records. She's not even asked her opinion. She gives her opinion without anyone requesting it that it was related. And Dr. Lyle, while it was not as explicit as might be hoped for, certainly establishes that he believes that the condition from which Mr. Roberts was complaining was due to acute trauma. I don't see we have time on that part. Thank you, sir. Good morning. My name is Steve Plaza, and I represent the court that responded in this case. The standard of review is a unanimous weight. The commission's decision should not be reversed unless an opposite conclusion is clearly apparent. This court has acknowledged great deference to the commission as to medical issues due to the commission's expertise. Can we hone in on what seems to be your central argument? We spent a lot of time on it here this morning. Dr. Cohen is alleging and arguing that Dr. Cohen misinterpreted the actions of the claimant and misinterpreted how he struck the lock, what motion, and what he hit it with. So how do you respond to that? Dr. Cohen's deposition testimony is clear, is that when he struck the lock, his wrist was stabilized, it was engaged with the rest of his hand. Using the hand as a hammer. And if Justice Kavanaugh pointed out, a hammer can be thrown up, a hammer can be thrown down. Sometimes a hammer can be even going to the side. So regardless of whether Dr. Cohen believes he's hitting it up, which I think that's the logical way to close a lock. If you're going to close a lock, you're going to close it upwards. I was at the deposition testimony, and that's Dr. Cohen at the deposition testimony. So even if he's going down, which doesn't make any sense because you're lying. Let's just assume it's an uppercut. Yes. Because that is what was testified to by the claimant. It's an uppercut, and the claimant clearly testified that the lock was halfway between the inside and the outside of his hand, hitting on the base of his hand. Now Dr. Cohen... In the base of his hand. I'm sorry, the base of his hand. You mean along here? No, along here. Petitioner here in a cross-examination testified that it was along the base of his hand, that the lock was centered between his thumb and where his little finger, the side of the hand and the little finger. It was on the center of the hand at the base where he was hitting the lock. Now Dr. Cohen references the thunder remnants, which is here, it's still on the base of the hand, but it's more on the little finger side. But either way, if you're hitting... Dr. Cohen was clear, when you're using the hand in that manner, the wrist is engaged and stabilized. If you're using it as a hammer, it's not going to hyperflex. He's clearly said, regardless, that it's not a mechanism of injury which would cause either a TFCC tear or a tear in the scapula, because there wouldn't be no hyperextension. Now there's no evidence in the record that there wasn't a hyperextension to the hand until he takes the stand. He testifies in direct examination that he hyperextended his hand during cross-examination when asked about exactly where the lock was. Where the lock was when he struck with his hand doesn't make any sense because it's not going to cause hyperextension if you're using that part of the hand on the base of the palm, the base of the hand, to close the lock. So in essence, are you saying that she's making an unwarranted interpretation, shall we say, or assumption relative to what Dr. Cohen testified to as to what the claimant did? You're saying it's not a misinterpretation of what the claimant did? I think the argument is that there was a hyperextension of the hand, and I don't think Dr. Cohen ever says there's a hyperextension of the hand. The only person who ever says there's a hyperextension of his hand is Petitioner when he testifies in direct examination. He said, I hyperextended my hand. But that's two and a half years after the date of accident. There's no evidence in the record. I don't think that's her argument. Her argument is Cohen's testimony has to be interpreted as his understanding that the mechanism of injury was a downward striking of the lock, whereas the claimant testified that it was an upward motion. And I think what you're saying is there's no evidence in the record that Cohen actually believed that the mechanism of injury was a downward striking. Right, because his key reference is that he's using the hand as a hammer. And like I said, I was there during the deposition testimony, and he kept going upwards. He never went down. But even if he did go down, even if he did think it was down, whether you're going up or whether you're going down, if you're using the hand as a hammer, your hand isn't, your wrist isn't engaged, it's not going to hyperflex. Well, that has to be the argument. Right, we're dancing around with one hand up. Well, we have a little anatomical difference here in terms of describing things. If you hit with your wrist, that's not hitting with your hand or the palm of your hand. And I hear this described all over. Because if you're hitting here, this is the bottom of the palm of your hand. Hit there sometimes, and you'll hyperflex. So it's very crucial. It's the base of the hand is what it is. The base of the hand. The testimony of cross-examination was it was the base of the hand between the thumb. Halfway, it was in the middle between where the side of the thumb is and where the side of the little finger is. That was the base of the hand as a testimony of cross-examination. Dr. Cohen references he was told by the petitioner that it was the finger eminence, which is the base of the hand, but that's on the little finger side. But you're still talking about the base of the hand. I don't think anybody, nobody in the record ever says that he hit the hand above, below the base of the hand. So there was no straightening at all. It was always the base of the hand. Except for the claimant saying that during that striking of the lock, there was hyperextension. Correct. But he obviously didn't tell that to Dr. Cohen. Dr. Cohen didn't. When Dr. Cohen makes a history of petitioning, there's no history that he actually held his hand. Dr. Cohen's clear in his report and his testimony that there was no hyperextension of the hand. So that leads to the inference that Petitioner never told Dr. Cohen there was a hyperextension. He only says there's hyperextension when he takes a stand two and a half years after the accident. And I would also like to point out that it takes him 17 days to seek medical treatment, and his initial complaints, well his initial history is that he has a full range of motion, and he has good grip strength with the hand. It's not until he finds out the MRI that's done on June 22, 2012, after he finds out that, oh, the MRI shows that you have a tear in your wrist, that's when he's saying he's got weakness and stiffness in his hand. And it wasn't before, it wasn't present in his histories before he actually gets the results of the MRI. So I think, based on the evidence, that the evidence does support the Commission's decision, and an opposite conclusion than what was reached by the Commission is not clearly apparent, and the Commission's decision must be affirmed in its entirety. And granted there is, you know, Dr. Dunbar references one sentence in the records that is work-related, Dr. Lyle says that it's trauma-inclused injury, but we only have those two sentences for use with a doctor, but we have a full report from Dr. Cohn, we have Dr. Cohn's testimony, direct examination, cross-examination, redirect, recross, and Dr. Cohn's testimony is as to how the mechanism of injury cannot cause the condition of well-being is unrebutted. So in that sense, the Commission's decision must be affirmed in its entirety. Thank you. Thank you, counsel. Counsel, you may reply. Thank you. I would agree with counsel that Dr. Cohn's opinion that his understanding of the mechanism of injury may not have caused a relationship with the petitioner's condition, he may actually be right about that. He's just not right about the mechanism of injury. First of all, I did look up the page numbers. The record is C859 through C864 with respect to Dr. Cohn's testimony that I referenced. Those are the page numbers that coincide with the record. What is unrebutted, what is unquestioned, is the testimony of the petitioner. The fact that it was at the time of trial, well, that's the time when the petitioner provides his testimony under oath. That's the appropriate time for the petitioner to testify as to what happened. Dr. Cohn didn't exactly understand what happened, and you've got to ask the petitioner. I believe the petitioner testified that the appointment, the independent medical evaluation appointment, was quite short. But what I will call your attention to is on C1018, it's a testimony of the petitioner, and the question is, what position did your wrist take at the moment of impact? Answer, bent backwards. Question, when you say bent backwards, you mean if I'm holding my hand facedown in front of me, lifting my hand up so that my fingers are pointing directly upwards. The answer is probably not that far, but you know, 45 degrees. So the petitioner testified, very specifically, it was unrebutted, uncontroverted, that when he hit the lock on the third time, he doesn't use the word hyperextended, but I wouldn't expect him to, his hand bent back to 45 degrees. That is not what Dr. Cohn's understanding of the accident is. On the third time? On the third time. He struck the lock three times, each time being harder than the time before. On that third time is when his hand hyperextended and he suffered the injury we're here today to discuss. Dr. Cohn did not understand that. He did not have clear comprehension of the way, of the mechanism of injury. His testimony cannot be relied upon because it does not rely upon. The arbitrator found was an accident. He listened to the petitioner and found that that is how the accident occurred. That is not Dr. Cohn's understanding of it. And that testimony cannot be relied upon for forming the basis of cause and connection. Thank you very much. If you have no further questions. I don't believe there are. Thank you, counsel Bowles, for your arguments in this matter. And thank you for taking the advisement and written disposition.